1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DAVID HASTINGS,<br><br>                              Plaintiff,<br><br>     v.<br><br>FORD MOTOR COMPANY, *et al.*,<br><br>                              Defendants. | Case No. 19-cv-02217-BAS-MDD<br><br>**ORDER:**<br><br>**(1) GRANTING IN PART AND DENYING IN PART PLAINTIFF'S MOTION TO AMEND (ECF No. 87); AND**<br><br>**(2) GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT (ECF No. 85).** |

In 2013, Plaintiff David Hastings bought a new truck manufactured by Defendant Ford Motor Company. Throughout more than six years after his purchase, Hastings brought his truck to Ford's authorized dealerships to have the truck inspected and repaired for various issues, including problems with its Nitrogen Oxide ("NOx") sensors. In 2019, Hastings brought the present action in state court, naming Ford and a dealership, Ford of Chula Vista, as defendants. Against Ford, Hastings raised a federal claim for breach of express warranty under the Magnusson-Moss Warranty-Federal Trade Commission

Improvement Act ("MMWA"), 15 U.S.C. §§ 2301 *et seq.*, and a state-law claim for fraud by omission, among other claims.

Ford moves for summary judgment on all claims.  (ECF No. 85.)  Hastings moves for the Court's leave to file a Second Amended Complaint ("SAC").  (ECF No. 87.)  Below, the Court finds that Hastings has not established a genuine issue of material fact as to his claims and grants Ford's motion for summary judgment.  The Court grants Hastings's request to dismiss his claim for negligent repairs and denies the remaining parts of his motion to amend as futile.

# BACKGROUND

## I.    Facts

On March 8, 2013, Hastings purchased a new 2013 Ford F-350 6.7L diesel Super Duty pickup truck, VIN 1FT8W3DT0DEA03223, from a Ford dealership in Vernon, Texas, and drove it to his home in California.  (Joint Statement of Undisputed Material Facts, "JSUMF," ECF No. 105 at ¶¶ 1, 4.)

Ford's New Vehicle Limited Warranty provided:

Your NEW VEHICLE LIMITED WARRANTY gives you specific legal rights.  You may have other rights that vary from state to state.  Under your New Vehicle Limited Warranty if:
- your Ford vehicle is properly operated and maintained, and
- was taken to a Ford dealership for a warranted repair during the warranty period,

then authorized Ford Motor Company dealers will, without charge, repair replace, or adjust all parts on your vehicle that malfunction or fail during normal use during the applicable coverage period due to a manufacturing defect in factory-supplied materials or factory workmanship.

This warranty does not mean that each Ford vehicle is defect free.  Defects may be unintentionally introduced into vehicles during the design and manufacturing processes and such defects could result in the need for repairs. For this reason, Ford provides the New Vehicle Limited Warranty in order to

remedy any such defects that result in vehicle part malfunction or failure during the warranty period.

(JSUMF ¶ 15.)  The New Vehicle Limited Warranty included Bumper to Bumper Coverage that lasted for three years or 36,000 miles, whichever came earlier, and Powertrain Coverage that lasted for five years or 60,000 miles, whichever came earlier.  (2013 Model Year Ford Warranty Guide ("2013 Warranty Guide") at 8, ECF No. 95-1 at FORD-HASTINGS0000108.)  The Powertrain Coverage extended to the Engine,[1] Transmission,[2] Front-Wheel Drive,[3] and Rear-Wheel Drive.[4]  (Id. at 10–11.)  Ford provided that the remedy under the New Vehicle Limited Warranty was limited to "repair, replacement, or adjustment of defective parts."  (Id. at 9.)  Ford's Warranty Guide states "[t]his exclusive remedy shall not be deemed to have failed its essential purpose so long as Ford, through its authorized dealers, is willing and able to repair, replace, or adjust defective parts in the prescribed manner."  (Id.)  The New Vehicle Limited Warranty expressly excluded from its coverage "the replacement of parts due to normal wear and tear."  (Id. at 13.)  Hastings understood that the warranty was intended to address any defects that may arise during the warranty.  (JSUMF ¶ 8.)

The truck also came with Ford's Federal and California Emissions Warranties.  The Federal Emissions Warranty is composed of Emissions Defects Warranty and Emissions Performance Warranty.  (2013 Warranty Guide at 17.)  The Emissions Defects

---

[1] "Engine" includes "all internal lubricated parts, cylinder block, cylinder heads, electrical fuel pump, electronic engine control unit, engine mounts, flywheel, injection pump, manifold (exhaust and intake), manifold bolts, oil pan, oil pump, seals and gaskets, thermostat, thermostat housing, timing chain cover, timing chain (gears or belt), turbocharger/supercharger unit, valve covers, [and] water pump." (Id. at 10.)

[2] "Transmission" includes "all internal parts, clutch cover, seals and gaskets, torque converter, transfer case (including all internal parts), transmission case, [and] transmission mounts." (Id. at 11.)

[3] "Front-Wheel Drive" includes "axle shafts, bearings (front and rear), center support bearing, drive shafts, final drive housing (including all internal parts), hubs-automatic front locking (four-wheel drive), locking rings (four-wheel drive), seals and gaskets, universal and constant velocity joints." (Id.)

[4] "Rear-Wheel Drive" includes "axle shafts, bearings (front and rear), center support bearing, drive axle housing (including all internal parts), drive shaft, propeller shafts, retainers, supports, seals and gaskets, universal and constant velocity joints." (Id.)

Warranty promised that the truck or engine was "designed, built, and equipped to meet—at the time it is sold—the emissions regulations of the U.S. Environmental Protection Agency (EPA)" and "free from emission-related defects in factory-supplied materials or workmanship, which are defects that could prevent the vehicle or engine from conforming with applicable EPA regulations." (*Id.* at 18.)  Ford promised diagnosing, repairing, replacing, or adjusting parts containing an emissions-related defect free of charge. (*Id.*) The warranty extended to all emissions-related sensors used with the covered components.[5] The warranty coverage period for catalytic converters, electronic emissions control unit, and onboard emissions diagnostic devices was 8 years or 80,000 miles; and for all other parts, 3 years or 36,000 miles. (*Id.*)  If the covered part is one "that should be replaced on a certain maintenance schedule," the warranty period extended only until "(a) the first replacement time that is specified in [the applicable] Owner's Manual; or (b) the time or mileage limits of the Federal Defect and Performance Warranties (whichever occurs first)." (*Id.* at 21.)

Ford's California Emissions Warranty provides additional coverage to ensure a vehicle complies with the regulations of the California Air Resources Board.  (2013 Warranty Guide at 22.)  The California Emissions Warranties promised that all eligible

---

[5] The components covered by the federal emissions warranties include: Air Flow Sensor; Air/Fuel Feedback Control System and Sensors; Air Induction System; Catalytic Converters (including Selective Catalytic Reduction and Diesel Oxidation Catalysts); Cold Start Enrichment System (diesel only); Controls for Deceleration (diesel only); Diesel Exhaust Fluid System; Diesel Particulate Filter; Electronic Ignition System (diesel only); Electronic Engine Control Sensors and Switches; Powertrain Control Module (PCM)/Engine Control Module (ECM), including hardware and emissions related software changes only; Evaporative Emission Control System; Exhaust Gas Recirculation (EGR) System; Exhaust Manifold; Exhaust Pipe (Manifold to Catalyst); Fuel Filler Tube and Seal (non-diesel only); Fuel Injection System; Fuel Injector Supply Manifold; Fuel Tank (non-diesel only); Fuel Tank Pressure Control Valve; Idle Air Bypass Valve; Ignition Coil and/or Control Module; Intake Manifold; Intercooler Assembly - Engine Charger; Malfunction Indicator Lamp (MIL)/On-Board Diagnostic (OBD) System; PCV system and Oil Filler Cap; Secondary Air Injection System; Spark Control Components; Spark Plugs and Ignition Wires; Thermostat; Throttle Body Assembly (MFI); Transmission Control Module (TCM) and Solenoids; Turbocharger Assembly; and Vacuum Distribution System.  (*Id.* at 20.)

vehicles[6] were designed, built, and equipped to meet California's anti-smog standards. (*Id.* at 24.) For the first three years or 50,000 miles, Ford promised: (1) if the vehicle fails a smog check inspection, Ford would make "all necessary repairs and adjustments" to ensure that the eligible vehicle passes the California inspection ("Performance Warranty"); and (2) if any emissions-related part on the eligible vehicle is defective, Ford would repair or replace the part ("Short-term Defects Warranty"). (*Id.*) In addition, Ford provided California Long Term Defects Warranty for the first seven years or 70,000 miles, which promised that Ford would repair or replace for free any covered part[7] that is defective or causes the vehicle to fail a smog check inspection ("Long-term Defects Warranty"). (*Id.*) If a part is one that should be replaced on a certain maintenance schedule, the period extended "until the first required replacement time that is specified in [the] Owner's Manual." (*Id.* at 29.) Defects Warranties do not apply "[i]f the diagnosis does not reveal a defect." (*Id.*)

More than a year after purchasing the truck, Hastings began experiencing problems related to the truck's engine and certain related parts. (JSUMF ¶ 9.) On or around September 9, 2014, with about 14,091 miles on the odometer, Hastings brought his truck to Ford's authorized repair facility in Colorado, to have the truck inspected for the illuminated coolant-additive and check-engine lights. (*Id.* ¶ 16.) A technician found diagnostic trouble codes P22A7 and P2A01 stored on the truck and cleared them. (*Id.*)

---

[6] An eligible vehicle is one "registered in a state that has adopted and is enforcing California emission warranty regulations applicable for [the] vehicle at the time of repair," and "certified for sale in California as indicated on the vehicle emission control information label." (*Id.* at 22.)

[7] For 2013 6.7L Ford Superduty, the parts covered under the California Long Term Defects Warranty included: Diesel Catalyst and Particulate Filter Assembly, Diesel Exhaust Fluid Pressure Line, Diesel Exhaust Fluid Tank, Turbocharger Actuator Assembly, Turbocharger, Charge Air Cooler, Fuel Supply Manifold Assembly, Intake Manifold, Exhaust Manifolds (left- and right-hand), Exhaust Manifold Gasket, EGR Cooler, Fuel Injector Kit, High Pressure Fuel Pump, High Pressure Fuel Line, Powertrain Control Wiring Harness, Powertrain Control Module (PCM)/ Engine Control Module (ECM), Main Body Wiring Harness (for MIL illumination only), Main Wiring Assembly (for MIL illumination only), Rear Lamp Wiring Assembly (for MIL illumination only), and Fuel Sender Wiring Assembly (for MIL illumination only). (*Id.* at 27–28.)

The dealership told Hastings that they did not have the parts to fix his truck and instead advised him to bring the truck to another dealership in California. (*Id.*) The dealership charged Hastings approximately $98, which Ford later reimbursed to him. (*Id.*) Hastings brought his truck to an authorized repair facility in California on or around September 11, 2014, with about 14,800 miles on the odometer, to have the truck inspected for an illuminated check-engine light. (*Id.* ¶ 17.) A technician at the California repair facility found code P22A7 stored on the truck and replaced the NOx 12 sensor. (*Id.*) This repair was covered under warranty and provided at no cost to Hastings. (*Id.*)

On or around February 12, 2015, with about 18,994 miles on the odometer, Hastings brought his truck to an authorized repair facility for an emission-related recall, Recall 14E03. (*Id.* ¶ 19.) A technician reprogrammed the powertrain control module and transmission control module to improve drivability issues. (*Id.*) The repair was covered under warranty and provided at no cost to Hastings. (*Id.*)

On or around May 23, 2016, with approximately 28,054 miles on the odometer, Hastings brought his truck to an authorized repair facility for the illuminated coolant-additive light. (*Id.* ¶ 20.) A technician added some coolant additive, for which Hastings paid approximately $45. (*Id.*)

On or around September 6, 2017, with about 35,388 miles on the odometer, Hastings brought his truck to an authorized repair facility for various concerns including reduced engine power and illumination of the check-engine light. (*Id.* ¶ 21.) The dealership's technicians noted that they "verified reduced power display." (*Id.*) A technician found codes P2A01 and P0234 stored. (*Id.*) While the technician was removing the exhaust gas recirculation pipe, bolts snapped due to burnt oil collected at the charge air cooler, which necessitated removing and flushing the charge air cooler. (*Id.*) The technician replaced the NOx sensor. (*Id.*) The technician also replaced a manifold and turbo charger. (*Id.*) These repairs were covered under warranty and provided at no cost to Hastings. (*Id.*)

- 6 -

19cv2217

On or around August 17, 2018, with approximately 39,005 miles on the odometer, Hastings had his truck towed to an authorized repair facility for concerns including the engine having no power. (*Id.* ¶ 24.) The dealership's technician found a blown-off charge air cooler boot, failure in the boot to throttle body, excessive back pressure in the charge air cooler, and failure in the diesel particulate filter. (*Id.*) The dealer replaced the following parts: tube air cooler outlet, catalytic converter assembly, and exhaust gas differential pressure sensor. (*Id.*) The repairs were not covered under warranty and Hastings initially paid $5,000 or more for the repairs. (*Id.*) After Hastings filed complaints, Ford reimbursed him $4,000, and the dealer paid $656.79. (*Id.*) In the end, Hastings bore around $1,000 of out-of-pocket costs for these repairs, not including an estimated $1,250 of related expenses ("towing, car rental, and other expenses associated with waiting while out of town for the repairs"). (*Id.*)

Hastings alleges he purchased a Ford Extended Service Plan on October 1, 2018, for $3,330. (Proposed SAC ¶ 24, ECF No. 87-3.) He was allegedly promised the provision of repair services for a $100 deductible payment per visit. (*Id.*) Ford's Warranty Guide describes the Extended Service Plan as "service contracts" that provide "extended protection after [the] Bumper to Bumper Warranty expires." (2013 Warranty Guide at 33.)

On or around May 29, 2019, Hastings requested a refund from Ford for his truck but Ford denied the refund request. (JSUMF ¶¶ 32–33.)

Ford issued Emissions Recall 21E01 on March 17, 2021. (*Id.* ¶ 29.) On April 14, 2021, Hastings brought his truck to a Ford authorized dealership for inspection, when a technician detected diagnostic trouble code P2201 stored on the truck. (*Id.*) Ford offered to perform Emissions Recall 21E01 on the truck but Hastings refused. (*Id.* ¶ 30.)

## II.   Procedural History

Hastings brought this action in San Diego County Superior Court on October 18, 2019, against Defendants Ford and Ford of Chula Vista. Against Ford, Hastings raised claims of (1) breach of express and implied warranties under the Song-Beverly Consumer

Warranty Act ("Song-Beverly Warranty Act"), Cal. Civ. Code §§ 1790–1795; (2) breach of express and implied warranties under the Magnuson-Moss Warranty-Federal Trade Commission Improvement Act ("MMWA"), 15 U.S.C. §§ 2301 *et seq.*; and (3) fraud by omission.  (State Compl., ECF No. 1-3.)  Against Ford of Chula Vista, Hastings raised a claim of negligent repairs.  (*Id.*)

Defendants removed the action to federal court, arguing that the Court had federal question jurisdiction over the MMWA claims against Ford and supplemental jurisdiction extended to the remaining claims, or, in the alternative, that the Court had diversity jurisdiction over all claims.  (Notice of Removal, ECF No. 1.)

Hastings filed his First Amended Complaint ("FAC").  (ECF No. 24.)  Against Ford, the FAC raised five causes of action under Sections 1793.2, 1794, and 1795.5 of the Song-Beverly Warranty Act; a cause of action for breach of express and implied warranties under the MMWA; and a fraud by omission claim.  (*Id.*)  Against Ford of Chula Vista, the FAC raised a claim of negligent repairs.  (*Id.*)

Defendants moved to dismiss the Complaint under Federal Rule of Civil Procedure 12(b)(6).  (ECF No. 32.)  The Court denied the motion as to Hastings's claims for negligent repairs and fraud by omission.  (ECF No. 40 at 4–11.)  With regards to the Song-Beverly Warranty Act claims, the Court converted Ford's Rule 12 motion to a Rule 56 motion, finding that the record was not clear as to whether Hastings purchased the subject vehicle in California.  (*Id.* at 11–13.)  The Court took the MMWA claims under advisement.  (*Id.* at 13.)

Hastings withdrew his Song-Beverly Warranty Act claims.  (ECF No. 42.)  Ruling on the MMWA claims, the Court denied Ford's Rule 12(b)(6) motion to dismiss Hastings's claim for breach of express warranty but granted the motion as to the claim for breach of implied warranty.  (ECF No. 43.)  As a result, Hastings's Song-Beverly Warranty Act claims and MMWA claim for breach of implied warranty were dismissed with prejudice. The following claims remain: (1) breach of express warranty under the MMWA and fraud by omission against Ford, and (2) negligent repairs against Ford of Chula Vista.

Ford moves for summary judgment on all remaining claims raised against it.  (Mot. for Summary Judgment, ECF No. 85.)  Hastings moves to amend his pleading for the second time.  (Pl.'s Mot. to Amend, ECF No. 87.)  The Court heard oral arguments on both motions on March 21, 2022.

## HASTINGS'S MOTION TO AMEND COMPLAINT

In his motion to amend, Hastings represents that he seeks to make the following amendments: (1) remove the negligent repair claim and dismiss Ford of Chula Vista as a defendant; (2) supplement the truck's repair history, including relevant repair visits that occurred after the FAC was filed;  and (3) define the claimed "Engine Defect" with more particularity as "one or more defects in [the] engine that can cause the nitrogen oxide (NOx) sensors installed in the [truck] to repeatedly fail."  (Pl.'s Mot. to Amend, ECF No. 87 at 1.) Ford opposes the amendment.  (Def.'s Opp'n, ECF No. 94.)

## I.    Rule 15 or Rule 16

Generally, Federal Rule of Civil Procedure 15(a) governs a motion for leave to amend pleadings before trial.  Under that rule, unless the amendment is one that is made for the first time within 21 days after serving the pleading or 21 days after service of a responsive pleading or motion, "a party may amend [its] pleading only by leave of court or by written consent of the party."  Fed. R. Civ. P. 15(a)(2).  The courts are required to freely grant leave "when justice so requires."  *Id.*

"Once the district court [files] a pretrial scheduling order pursuant to Federal Rule of Civil Procedure 16 which establishe[s] a timetable for amending pleadings [Rule 16]'s standards control[]."  *Johnson v. Mammoth Recreations, Inc.*, 975 F.2d 604, 607–08 (9th Cir. 1992).  The Rule 16 standard, which requires a showing of good cause to modify a scheduling order, is "more stringent" than that of Rule 15.  *See AmerisourceBergen Corp. v. Dialysist West, Inc.*, 465 F.3d 946, 952 (9th Cir. 2006); *Morgal v. Maricopa Cnty. Bd. of Supervisors*, 284 F.R.D. 452, 459 (D. Ariz. 2012).

- 9 -

Here, the Court's Rule 16 Scheduling Order did not establish a timetable for amending pleadings. (Scheduling Order, ECF Nos. 49, 70.) Hastings's motion to amend, filed on May 14, 2021, does not require a modification of the Court's Scheduling Order. Therefore, the Court applies the Rule 15 standard. *See Miramontes v. Mills*, No. CV 11-08603 MMM (SSx), 2015 WL 13609449, at *2 (C.D. Cal. May 18, 2015) (applying Rule 15 to the plaintiff's motion to amend filed after the defendant's motion for summary judgment where the court "never set a date certain by which any motion to amend had to be filed").

## II. Rule 15 Analysis

Because Hastings has already amended his pleading once as a matter of course and requests to file a SAC, Rule 15(a)(2) applies. The policy behind the Rule—that the courts should freely grant leave—"is to be applied with extreme liberality." *Morongo Band of Mission Indians v. Rose*, 893 F.2d 1074, 1079 (9th Cir. 1990). "[S]ince Rule 15 favors a liberal policy towards amendment, the nonmoving party bears the burden of demonstrating why leave to amend should not be granted." *Genentech, Inc. v. Abbott Laboratories*, 127 F.R.D. 529, 530–31 (N.D. Cal. 1989) (citing *Senza-Gel Corp. v. Seiffhart*, 803 F.2d 661, 666 (Fed. Cir. 1986)). Although the decision whether to allow amendment is within the court's discretion, "[i]n exercising its discretion, a court must be guided by the underlying purpose of Rule 15—to facilitate decision on the merits rather than on the pleadings or technicalities." *DCD Programs, Ltd. V. Leighton*, 833 F.2d 183, 186 (9th Cir. 1987) (quotation omitted).

Nevertheless, the court has discretion "to deny leave to amend due to . . . 'futility of amendment.'" *Nat'l Council of La Raza v. Cegavske*, 800 F.3d 1032, 1045 (9th Cir. 2015) (alteration in original) (quoting *Carvalho v. Equifax Info. Servs., LLC*, 629 F.3d 876, 892 (9th Cir. 2010)); *see Bonin v. Calderon*, 59 F.3d 815, 845 (9th Cir. 1995) ("Futility of amendment can, by itself, justify the denial of a motion for leave to amend.") An amendment is futile if, as amended, the plaintiff's claims cannot survive summary

judgment.  *See Gabrielson v. Montgomery Ward & Co.*, 785 F.2d 762, 766 (9th Cir. 1986) ("The district court's conclusion that adding a cause of action . . . would be futile was correct because any such cause of action could be disposed of by summary judgment.").

As an initial matter, Defendants do not oppose Hastings's request to abandon its negligent repairs claim against Ford of Chula Vista.  The Court accordingly dismisses the negligent repairs claim and dismisses Ford of Chula Vista as a defendant.

The remaining, proposed amendments concern Hastings's claims against Ford.  As will be explained in detail in the subsequent parts of this Order, the Court will grant Ford's motion for summary judgment as to all claims.  Because the proposed amendments would not alter the outcome, Hastings's motion to amend is futile.  *See Gabrielson*, 785 F.2d at 766.  Therefore, the Court denies the remaining parts of Hastings's motion to amend.

## FORD'S MOTION FOR SUMMARY JUDGMENT

### I.    Evidentiary Objections and Request for Judicial Notice

The parties raise objections against each other's summary judgment evidence.  (Pl.'s Objs., ECF Nos. 110, 113; Def.'s Objs., ECF Nos. 102, 103, 104.)  Hastings also filed a request for judicial notice.  (ECF No. 95-3.)  The Court first addresses these preliminary filings before reaching the merits of Ford's motion for summary judgment.

#### A.    Legal Standard

For a motion for summary judgment, "a party does not necessarily have to produce evidence in a form that would be admissible at trial."  *See Block v. City of Los Angeles*, 253 F.3d 410, 418–19 (9th Cir. 2001).  "Rule 56[(c)] requires only that evidence 'would be admissible,' not that it presently be admissible."  *Burch v. Regents of Univ. of Cal.*, 433 F. Supp. 2d 1110, 1120 (E.D. Cal. 2006); *see also Comite de Jornaleros de Redondo Beach v. City of Redondo Beach*, 657 F.3d 936, 964 n.7 (9th Cir. 2011) ("Rule 56 is precisely worded to exclude evidence only if it's clear that it cannot be presented in an admissible form at trial.")  Thus, "[t]he focus is on the admissibility of the evidence's contents, not its

form." *Estate of Hernandez–Rojas ex rel. Hernandez v. United States*, 62 F. Supp. 3d 1169, 1174 (S.D. Cal. 2014) (citing *Fonseca v. Sysco Food Servs. of Ariz., Inc.*, 374 F.3d 840, 846 (9th Cir. 2004)).  And while a court will consider a party's evidentiary objections to a motion for summary judgment, "[o]bjections such as lack of foundation, speculation, hearsay and relevance are duplicative of the summary judgment standard itself." *All Star Seed v. Nationwide Agribusiness Ins. Co.*, No. 12CV146 L BLM, 2014 WL 1286561, at *16–17 (S.D. Cal. Mar. 31, 2014) (citing *Burch*, 433 F. Supp. 2d at 1119–20).

## B.    Undisclosed Expert Testimony

The Court sustains Ford's objection to Hastings's witness Albert Shanefield's opinion on whether a vehicle presenting diagnostic trouble code P2201 will not pass a smog check in California, on the ground that it is undisclosed expert witness testimony.  (Ford's Obj., ECF No. 103; Shanefield Decl. ¶ 9, ECF No. 95-4 ("Based on my experience as a licensed Smog Check Technician, when diagnostic trouble code P2201 is present in a vehicle, that vehicle will not pass a smog check in California.").)

Federal Rule of Evidence 702 allows a witness "who is qualified as an expert by knowledge, skill, experience, training, or education" to "testify in the form of an opinion" if "the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue"; "the testimony is based on sufficient facts or data"; "the testimony is the product of reliable principles and methods"; and "the expert has reliably applied the principles and methods to the facts of the case." The parties are required to disclose the identity of any expert witness they may use at trial to present evidence under Rule 702, "accompanied by a written report[8]—prepared and signed by the witness."  Fed. R. Civ. P. 26(a)(2).

---

[8] If the witness is not required to provide a written report, the disclosure must state "the subject matter on which the witness is expected to present [expert] evidence under Rule 702" and "a summary of the facts and opinions to which the witness is expected to testify."  Fed. R. Civ. P. 26(a)(2)(C).

A party who does not disclose an expert witness "is not allowed to use that . . . witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless." *See* Fed. R. Civ. P. 37(c)(1). "Rule 37(c)(1) gives teeth to [expert disclosure] requirements [under Rule 26] by forbidding the use at trial of any information required to be disclosed by Rule 26(a) that is not properly disclosed." *Yeti by Molly, Ltd. v. Deckers Outdoor Corp.*, 259 F.3d 1101, 1106 (9th Cir. 2001). A plaintiff may not "create a material issue of fact by relying on expert testimony that they claim will not be used at trial." *Lannes v. Flowserve U.S., Inc.*, 628 F. App'x 957, 960 (9th Cir. 2015).

Here, it is undisputed that Hastings did not disclose Shanefield as an expert witness under Rule 26(a)(2) by the set deadline.[9] The objected-to portion of Shanefield's declaration—whether a vehicle presenting a certain diagnostic code is likely to pass a smog test or not—squarely falls within the scope of an expert opinion under Rule 702. Because Hastings did not designate Shanefield as an expert witness or submit the reports or statements required under Rule 26, Shanefield's expert opinion must be excluded under Federal Rule of Civil Procedure 37(c)(1). *See Quevedo v. Trans-Pac. Shipping, Inc.*, 143 F.3d 1255, 1258 (9th Cir. 1998) (upholding exclusion of belated expert designation and report of the plaintiff's expert, submitted in support of the plaintiff's opposition to the defendant's motion for summary judgment, where the reports and statements of the expert witness had not been disclosed in compliance with Rule 26).

Hastings mischaracterizes the objected-to statement as "testimony limited to . . . his percipient knowledge." Shanefield states that he participated in the inspection of

---

[9] Magistrate Judge Mitchell Dembin issued a scheduling order requiring all expert disclosures required by Rule 26(a)(2) to be served on all parties on or before February 1, 2021. (Scheduling Order, ECF No. 49.) Hastings did not serve any expert disclosure by the deadline. On March 12, 2021, Hastings moved, *ex parte*, for a continuation of expert disclosure deadline to May 3, 2021, stating as the reason for the request that the attorney who was responsible for tracking the expert disclosure deadline left the firm without advising the firm of the deadline. (Pl.'s *Ex Parte* Mot., ECF No. 60; Pl.'s Mem. P. & A., ECF No. 60-1 at 4.) Judge Dembin denied Hastings's request, concluding that "[c]ounsel's negligence in case management is not good cause to amend the scheduling order." (Order, ECF No. 70 at 2.)

1    Hastings's truck, when the diagnostic trouble code P2201 was retrieved.  (Shanefield Decl.

2    ¶¶ 7–8.)  That falls within the information that he perceived through observation of

3    Hastings's truck and its inspection.  However, whether or not Hastings's truck can pass the

4    smog test because of the code goes beyond the information he perceived at the inspection.

5

6              **C.     Remaining Objections and Request for Judicial Notice**

7              The remaining objections raised by the parties are numerous, and many of the

8    objections, including those regarding relevance, foundation, or speculation, are subsumed

9    within the summary judgment standard.  *E.g., Pauma Band of Luiseno Mission Indians of*

10   *the Pauma & Yuima Rsrv. v. California*, 343 F. Supp. 3d 952, 974 n.3 (S.D. Cal. 2018).

11   The Court will, in pertinent parts of the analysis to follow, address only those objections

12   that are relevant to determining whether the objected-to evidence creates genuine issues of

13   material fact for trial.  The objections that the Court does not address in this Order are

14   overruled as moot.  *See, e.g., Obesity Rsch. Inst., LLC v. Fiber Rsch. Int'l, LLC*, 310 F.

15   Supp. 3d 1089, 1107 (S.D. Cal. 2018) (denying as moot objections not needed for the

16   court's ruling on summary judgment motions).

17             The Court denies Hastings's request for judicial notice because the Court did not

18   rely on the document.  *See, e.g., Medina v. Cnty. of San Diego*, No. 08cv1252 AJB (RBB),

19   2012 WL 1033019, at *6 (S.D. Cal. Mar. 26, 2012) (denying as moot requests for judicial

20   notice on which the court did not rely to resolve the pending motions).

21

22   **II.   Summary Judgment Legal Standard**

23             "A party may move for summary judgment, identifying each claim or defense—or

24   the part of each claim or defense—on which summary judgment is sought."

25   Fed. R. Civ. P. 56(a).  Summary judgment is appropriate under Rule 56(c) where the

26   moving party demonstrates the absence of a genuine issue of material fact and entitlement

27   to judgment as a matter of law.  *See* Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477

28   U.S. 317, 322 (1986).  A fact is material when, under the governing substantive law, it

could affect the outcome of the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute about a material fact is genuine if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248.

A party seeking summary judgment always bears the initial burden of establishing the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323. The moving party can satisfy this burden in two ways: (1) by presenting evidence that negates an essential element of the nonmoving party's case; or (2) by demonstrating that the nonmoving party failed to make a showing sufficient to establish an element essential to that party's case on which that party will bear the burden of proof at trial. *Id.* at 322–23. "Disputes over irrelevant or unnecessary facts will not preclude a grant of summary judgment." *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987).

If the moving party meets this initial burden, the nonmoving party cannot defeat summary judgment merely by demonstrating "that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986); *see also Triton Energy Corp. v. Square D Co.*, 68 F.3d 1216, 1221 (9th Cir. 1995) ("The mere existence of a scintilla of evidence in support of the non-moving party's position is not sufficient."). Rather, the nonmoving party must "go beyond the pleadings and by 'the depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex*, 477 U.S. at 324 (quoting former Fed. R. Civ. P. 56(e)). "[W]hatever establishes a genuine issue of fact must *both* be in the district court file *and* set forth in the response." *Carmen v. San Francisco Unified Sch. Dist.*, 237 F.3d 1026, 1029 (9th Cir. 2001). Thus, courts may rely only on facts designated by the nonmoving party; it is not obligated to search the entire record for a triable issue of fact where none has been designated. *See id.* ("[R]equiring the district court to search the entire record, even though the adverse party's response does not set out the specific facts or disclose where in the record the evidence for them can be found, is unfair.").

When making this determination, the court must view all inferences drawn from the underlying facts in the light most favorable to the nonmoving party. *See Matsushita*, 475 U.S. at 587. "Credibility determinations, the weighing of evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge, [when] he [or she] is ruling on a motion for summary judgment." *Anderson*, 477 U.S. at 255.

## III.   Analysis

### A.   MMWA Breach of Express Warranty

Hastings brings a claim for breach of express warranty under the MMWA. Hastings alleges that Ford breached the applicable express warranties "by failing to repair the defects and nonconformities, or to replace the [truck]." (Proposed SAC ¶ 56.) Hastings's claim calls for the application of California Uniform Commercial Code. (Order at 5–6, ECF No. 43 (citing *Orichian v. BMW of N. Am., LLC*, 172 Cal. Rptr. 3d 876, 883 (2014), *as modified* (July 1, 2014)).)

Ford argues that Hastings cannot prove the essential elements of his MMWA claim because Hastings has no evidence that Ford sold him a vehicle with a design defect or that Ford failed to provide repairs as promised by the applicable express warranties.

### 1.  Proving Design Defect

The New Vehicle Limited Warranty covers a design defect.[10] The parties stipulate to the fact that the terms of the New Vehicle Limited Warranty cover defects that were "unintentionally introduced into vehicles during the design and manufacturing processes." (JSUMF ¶ 15.) The Ninth Circuit has interpreted this exact language and held that "the

---

[10] "A design defect . . . exists when the product is built in accordance with its intended specifications, but the design itself is inherently defective." *McCabe v. Am. Honda Motor Co.*, 100 Cal. App. 4th 1111, 1120, 123 Cal. Rptr. 2d 303 (2002). This is distinguishable from a manufacturing defect, which "exists when an item is produced in a substandard condition," and "is often demonstrated by showing the product performed differently from other ostensibly identical units of the same product line." *Id.*

warranty must be construed to guarantee against both manufacturing and design defects." *Daniel v. Ford Motor Co.*, 806 F.3d 1217, 1225 (9th Cir. 2015).

Ford argues that Hastings cannot show the existence of a design defect because he has offered no expert testimony. Under California law, there are "two alternative ways to prove a design defect": the consumer expectations test and the risk/benefit test. *Soule v. Gen. Motors Corp.*, 8 Cal. 4th 548, 566, 34 Cal. Rptr. 2d 607, 882 P.2d 298 (1994). The risk/benefit test requires expert testimony, but the consumer expectations test does not.

"[T]he consumer expectations test is reserved for cases in which the everyday experience of the products' users permits a conclusion that the product's design violated minimum safety assumptions, and is defective regardless of expert opinion about the merits of the design." *Soule*, 8 Cal. 4th at 567 (italics omitted). "For example, the ordinary consumers of modern automobiles may and do expect that such vehicles will be designed so as not to explode while idling at stoplights, experience sudden steering or brake failure as they leave the dealership, or roll over and catch fire in two-mile-per-hour collisions." *Id.* at 566 n. 3. No expert testimony is necessary to establish a design defect under the consumer expectation test because the test "focuses on the safety expectations of an ordinary consumer rather than those of an expert." *Long v. TRW Vehicle Safety Sys., Inc.*, 796 F. Supp. 2d 1005, 1010 (D. Ariz. 2011) (quoting *Bell v. BMW*, 181 Cal.App.4th 1108, 1129, 105 Cal.Rptr.3d 485 (2010)).

On the other hand, under the risk/benefit test, "a product is . . . defective if its design embodies excessive preventable danger, that is, unless the benefits of the design outweigh the risk of danger inherent in such design." *Soule*, 8 Cal. 4th at 567 (citations, alterations, and quotation marks omitted). Because weighing the risks and benefits of a particular design is beyond what ordinary consumers can adjudge, expert testimony is required to show design defect through the risk/benefit test. *See Demara v. The Raymond Corp.*, 221 Cal. Rptr. 3d 102, 118 (2017).

Here, Ford has met its initial burden by showing that Hastings has not offered any evidence, including expert testimony, to establish a design defect. The burden thus passes

to Hastings to produce enough evidence to create a genuine issue of material fact. Hastings has not met his burden. In the absence of an expert testimony, the only way that Hastings can prove design defect is through the consumer expectations test. Hastings designates no facts relevant to the safety expectations of an ordinary customer as relevant to the problems he experienced in his truck.

Therefore, the Court finds no genuine issue of material fact as to whether the truck contained a design defect.

### 2. Proving Failure to Replace and Repair

Hastings's alternative theory of breach of express warranty is that Ford's authorized dealers were not able to repair the defects in his truck during the warranty period after making a reasonable number of attempts to do so. (Proposed SAC ¶¶ 10–11.) Namely, Hastings argues that Ford failed to repair the truck's NOx sensors under the express warranties. Hastings also argues that the 2018 repairs that cost him about $1,000, in addition to other related expenses, should have been provided to him at no cost under the extended warranty.

To show breach of warranty based on failure to repair, the plaintiff must establish the following elements: (1) "an express warranty"; (2) "the existence of a defect covered by the warranty"; (3) "the buyer's notice to the seller of such a defect within a reasonable time after its discovery"; (4) "the seller's failure to repair the defect in compliance with the warranty"; and (5) "resulting damages." *Orichian*, 172 Cal. Rptr. 3d at 885 (citing Cal. Com. Code §§ 2313, 2607, 2714, 2715). Ford argues that Hastings offers no expert testimony to establish that the truck contained a defect and that any malfunction in the truck that occurred within the applicable warranty period was repaired each time the truck was presented to a Ford authorized dealer.

//

//

//

- 18 -

19cv2217

### a.    Ford's Evidence

#### i.    NOx Sensors

It is undisputed that Ford's authorized dealers performed repairs on the truck's NOx sensor on September 11, 2014, and on September 6, 2017, both of which were covered by warranty and provided at no cost to Hastings. (JSUMF ¶¶ 17, 21; Exs. D & E to Dye Decl., ECF No. 85-2 at 83–94.)  Ford argues each repair that was performed within the warranty period resolved the malfunction of the NOx sensor in Hastings's truck.   Ford offers Hastings's testimony that he had no complaints about the repairs he received on September 11, 2014. (Hastings Dep. 101:19–23, ECF No. 85-2 at 31.)  The next time the truck's NOx sensor was replaced was three years later, when Hastings brought his truck to an authorized Ford dealer in September 2017 for the illuminated check-engine light. (JSUMF ¶ 21; Ex. E to Dye Decl., ECF No. 85-2 at 83–94.)  Ford offers Hastings's deposition testimony that he did not think the September 2017 repairs were below standard and that he did not recall making any complaints after receiving that repair. (Hastings Dep. 144:8–20, ECF No. 85-2 at 40.)  It was not until 2020 that the truck indicated a diagnostic code for the NOx sensors. (Hastings Decl. ¶ 21, ECF No. 96-1.)  Ford argues that because the NOx sensors did not exhibit problems for approximately three-year intervals, Ford's repairs completed within the warranty period were successful.

The Court finds that Ford has met its initial burden of establishing the absence of a genuine issue of material fact as to whether it breached the express warranty by failing to repair the NOx sensor.

#### ii.    2018 Repairs

On August 17, 2018, the truck was towed to a Ford authorized dealership and was found with a blown-off charge air cooler boot, failure in the charge air cooler's boot to throttle body, and failure in the diesel particulate filter. (JSUMF ¶ 24.)  "The dealer replaced the following parts: tube air cooler outlet, catalytic converter assembly, and exhaust gas excessive back pressure, and diesel particulate filter failure," which were "non-

warrantable." (*Id.*)  The bill for the repairs totaled $5,656.79, and Hastings initially paid the entire amount out of pocket.  After Hastings filed complaints, Ford reimbursed Hastings $4,000, the dealership reimbursed him for another $656.79, and Hastings was out of pocket for the remaining $1,000, not including related expenses, estimated at about $1,250.  (*Id.*)

Ford argues Hastings cannot show that the August 2018 repair was covered under the express warranties.  Ford offers Hastings's testimony that Ford's dealership told him at the time that the truck's warranty had expired.  (Hastings Dep. 170:7–19.)  Alternatively, Ford argues that Hastings offers no evidence to show the diesel particulate filter failure was due to manufacturing defects.  Ford offers Hastings's testimony that before August 17, 2018, he had not presented the truck for repair of the diesel particulate filter.  (*Id.* 172:14–17.)  Hastings also testified that, after the August 2018 repair, he did not experience more problems with the diesel particulate filter or the charge air cooler.  (*Id.* 180:10–12, 16–18.)

The Court finds that Ford has met its initial burden of establishing the absence of a genuine issue of material fact as to whether it breached the express warranties by not paying in full for the 2018 repairs.  The burden thus passes to Hastings to designate specific facts showing that there is a genuine issue for trial as to whether Ford breached the repair and replacement warranties.

### b.    Hastings's Evidence

#### i.    NOx Sensors

Hastings argues that "Ford's repeated replace[ment] of the engine and its related parts, including the multiple replacement of the NOx sensor is more than sufficient to show a breach of Ford's express warranty."  (Pl.'s Opp'n at 29:9–11.)  In his opposition brief, Hastings designates the following as facts supporting his theory of defect: his truck's NOx sensor was replaced in 2014 and 2017, yet on or around September 15, 2020, his truck indicated code P2201, which, according to Ford's 30(b)(6) witness, indicates that the NOx sensor was out of range.  (Hastings Decl. ¶¶ 15, 21, ECF No. 96-1; Kalis Dep. 73:4–12, Ex. 8 to Sogoyan Decl., ECF No. 95-2 at 278.)  On October 19, 2020, Hastings brought his

truck to a Ford-authorized dealership, when the truck again indicated code P2201. (Hastings Decl. ¶ 22.)  On March 8, 2021, the truck indicated code P2201 again at a Ford authorized dealership.  (*Id.* ¶ 24.)  At that time the dealership replaced the NOx 11 and NOx 12 sensors.  (*Id.*)  On April 14, 2021, when the truck was inspected, it again indicated code P2201.  (JSUMF ¶ 30.)  Ford offered to perform the Emissions Recall 21E01, but Hastings declined.  (*Id.*)

Setting aside Ford's evidentiary objections against Hastings's designated facts, the Court does not find that Hastings has met his burden to show genuine issue of material fact for trial.  Hastings lists the following as express warranties that Ford breached: the New Vehicle Limited Warranty, California and Federal Emissions Warranties, 18M03 extended warranty for the charge air cooler, the 21N05 extended warranty for the NOx sensor, 21N02 extended warranty, and the Ford Extended Service Plan.  The Court examines each warranty in turn to determine whether any supports Hastings's claim for breach of express warranty.

**New Vehicle Limited Warranty**   Ford's Bumper-to-Bumper New Vehicle Limited Warranty expired on March 8, 2018, or 36,000 miles, whichever came earlier.[11] "The general rule is that an express warranty 'does not cover repairs made after the applicable time or mileage periods have elapsed.'"  *Daugherty v. Am. Honda Motor Co.*, 51 Cal. Rptr. 3d 118, 122 (2006) (quoting *Abraham v. Volkswagen of Am., Inc.*, 795 F.2d 238, 250 (2d Cir. 1986)), *as modified* (Nov. 8, 2006).  "[A]s a matter of law, in giving its promise to repair or replace any part that was defective in material or workmanship and stating the car was covered for [a limited warranty period]," Ford "did not agree, and plaintiff[] did not understand it to agree, to repair latent defects that lead to a malfunction

---

[11] Hastings does not argue that the NOx sensors were covered under the New Vehicle Limited Warranty's Powertrain Coverage.  In addition, Hastings offers no argument or evidence as to whether the warranty period should have been tolled.

after the term of the warranty." *Id.* at 123.  There is no genuine issue of triable fact as to whether the 2021 repair of the NOx sensor was covered by the Bumper-to-Bumper Warranty.

Hastings points to no competent evidence that would show the repairs performed within the New Vehicle Limited Warranty's warranty period were not successful.[12]  He also has not shown that any latent issues with the NOx sensors that arose in 2020 after the warranty expired extended the Bumper-to-Bumper Warranty's warranty period.  The Court finds instructive the findings in *Nunez v. FCA US LLC*, 275 Cal. Rptr. 3d 618 (2021).  There, the court found that a latent defect was outside the express warranty period where a previous replacement of a car part had "resolved the problem for two and a half years after the expiration of the stated term of the [express] warranty."  *Id.* at 627 (holding that the latent defect did not extend the warranty period and thus was not covered under the warranty).  The evidence proffered by Hastings portray circumstances almost identical to that in *Nunez*.  Before the Bumper-to-Bumper Warranty expired, Hastings's truck necessitated replacement of the NOx sensors in approximately three-year intervals: in 2014 and 2017.  It was not until September 2020, more than two and a half years after the expiration of the New Vehicle Limited Warranty, that the truck presented code P2201, indicating that the NOx sensor was out of range.  As the court found in *Nunez*, the problem with the NOx sensor detected in 2020 did not extend the express terms of the New Vehicle Limited Warranty beyond its expiration period because the 2017 repair had resolved the need for repair for two and a half years.  Hastings offers no evidence to the contrary.  Hastings relies on *Jensen v. BMW of N. Am., Inc.*, 41 Cal. Rptr. 2d 295 (1995), *as modified on denial of reh'g* (June 22, 1995), to argue that a jury can reasonably infer that the truck

---

[12] To the extent that the declarations by Hastings or his counsel imply the NOx sensors presented problems that were not due to normal wear and tear, neither Hastings nor counsel is competent to testify to that proposition.  *See* Fed. R. Civ. P. 56(c)(4) ("An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated.").

contained a defect because the NOx sensors were only temporarily fixed by the repairs. *Jensen* is factually distinguishable from this case.  There, the plaintiff attempted to repair the brake shimmy in her car on five occasions in a two-year period, and the brake shimmy reoccurred within a few thousand miles after each repair.  Considering this fact and the plaintiff's expert testimony, the *Jensen* court concluded that the jury could reasonably infer that the dealership's repair only provided temporary relief and failed to repair the car.  Here, both the duration of the time period at issue (more than six years) and the intervals between the repairs (approximately three years) are much longer than that presented in *Jensen.* Therefore, *Jensen* is not applicable.

The Court concludes that Hastings has not met his burden to show that there is a genuine issue of material fact as to whether the latent problems with the NOx sensor constituted a breach of the New Vehicle Limited Warranty.

**Emissions Warranties**  Hastings argues that Ford breached the Federal and California Emissions Warranties.  Both warranties extend only to covered parts listed in Ford's Warranty Guideline.  (2013 Warranty Guideline at 20–21, 26–28.)  Where, as here, the applicable emissions warranty limits coverage to listed components, the plaintiff claiming a breach of the emissions warranty "must show that the defects were caused by components the . . . emissions warranty covers." *See Yi v. BMW of N. Am., LLC,* No. 2:17-CV-06467-SVW, 2018 WL 3359016, at *8 (C.D. Cal. May 24, 2018).  That showing must be supported by an expert witness testimony "because only a witness with technical knowledge can testify to the cause of a defect." *Id.*  Here, Hastings offers no expert testimony and relies solely on his own affidavit and argument to support his position that the NOx sensor in his truck was defective and is a part covered by Ford's Federal and California Emissions Warranties.  No reasonable factfinder can return a verdict for Hastings on this record.  Therefore, Hastings has not shown a genuine issue of material fact.

**21N02, 21N05 Extended Warranties for NOx Sensors**   Hastings argues that Ford breached extended warranties applicable to the truck's front and rear NOx sensors. Hastings submits two letters: one entitled "Customer Satisfaction Program 21N05," and another entitled "Customer Satisfaction Program 21N02," both dated March 17, 2021.  The two documents state that Ford will provide "one-time repair" of a qualifying vehicle's front or rear NOx sensors at no charge to the owner during a set twelve-month period.  (Exs. 3, 14 to Sogoyan Decl., ECF No. 95-2 at 123–24, 512–18.)  To qualify, a vehicle must have had Emissions Recall 21E01 completed, and brought to a Ford dealer within "twelve months after Emissions Recall 21E01 is completed or December 31, 2024."  (*Id.* at 123, 512.)

Setting aside Ford's evidentiary objections, and assuming without deciding that 21N02 and 21N05 constitute express warranties applicable to Hastings's truck, Hastings has not shown that a genuine issue of material fact exists as to whether Ford breached the terms of 21N02 and 21N05.  It is undisputed that Hastings declined Ford's offer to perform Emissions Recall 21E01 on his truck on April 14, 2021.  (JSUMF ¶ 30.)  Because Emissions Recall 21E01 must take place before a vehicle becomes eligible for Customer Satisfaction Programs 21N02 or 21N05, and Hastings refused to have the recall performed on his truck, no reasonable factfinder can conclude that Ford breached the terms of the extended warranties.

**Ford Extended Service Plan**   Hastings argues that Ford breached the terms of Ford's Extended Service Plan he purchased on October 1, 2018.  The Ford Extended Service Plan is described by Ford's Warranty Guide as "service contracts" that provide "extended protection after [the] Bumper to Bumper Warranty expires."  (2013 Warranty Guide at 33.)

Assuming without deciding that the Ford Extended Service Plan constitutes an express warranty, Hastings has not shown that a genuine issue of material fact exists as to whether Ford breached the warranty.  "Under California law a claim for breach of express

warranty requires a showing of 'the exact terms of the warranty.'" *Stanley v. Bayer Healthcare LLC*, No. 11CV862-IEG BLM, 2012 WL 1132920, at *10 (S.D. Cal. Apr. 3, 2012) (quoting *Williams v. Beechnut Nutrition Corp.*, 229 Cal. Rptr. 605, 608 (Ct. App. 1986).) Here, Hastings does not allege the terms of the Extended Service Plan other than that Ford "would have charged [Hastings] a $100 deductible every time [the Service Plan] was used." (Proposed SAC ¶ 24.) Hastings attaches to his Declaration pictures of printouts of what he alleges is the Extended Service Plan, which only show tables with certain numerical values. (Ex. 10 to Hastings Decl., ECF No. 95-1 at 95–96.) Nothing in the record shows the exact terms of the Extended Service Plan—namely, its warranty period. Because "[Hastings] has not met his burden of providing the Court with the terms of the [alleged] express warranty," Ford is "entitl[ed] . . . to summary judgment on that basis alone." *See May v. KCS Int'l, Inc.*, No. SACV 09-01336 DOC (MLGx), 2011 WL 13268067, at *3 (C.D. Cal. June 7, 2011).

### ii.    2018 Repairs

To the extent that Hastings argues that under Ford's extended warranty, 18M03, Ford should have covered the full cost of the 2018 repairs, the Court does not find that Hastings has shown a genuine issue of material fact for trial. Hastings attaches a letter dated January 7, 2019, with the subject line, "Customer Satisfaction Program 18M03," which states that if a vehicle presents the charge air cooler tube with loose connections, disconnection from the throttle body, or fractures "that may lead to loss of power and/or an illuminated Malfunction Indicator Light (MIL) accompanied by [diagnostic trouble code] P0299," Ford will replace the charge air cooler outlet tube and clear the trouble code at no cost to the vehicle owner. (Ex. 2 to Sogoyan Decl., ECF No. 95-2 at 120.) Ford's evidentiary objections aside, the document shows that 18M03 was issued on January of 2019, whereas the relevant repairs took place in 2018. (*Compare* Ex. 2 to Sogoyan Decl., ECF No. 95-2 at 120 *with* JSUMF ¶ 24.) Hastings offers no authority or evidence that suggests 18M03 were to be applied retroactively to cover the repairs performed before

18M03 went into effect.  In addition, it is undisputed that on or around August 17, 2018, a Ford authorized dealer replaced the truck's tube air cooler outlet.  (JSUMF ¶ 24.)  Hastings makes no showing that after this repair, his truck exhibited problems described by 18M03. Therefore, no reasonable trier of fact can conclude that Ford breached the terms of 18M03 by charging Hastings for a part of the costs for the repairs performed in 2018.

### iii.    Ford's Rejection of Refund Request

To the extent that Hastings argues that Ford breached the express warranties by denying his May 29, 2019 request for Ford to buy back his truck or give him a full refund, he offers no evidence to suggest that the terms of any of the warranties provided for such a solution.

In sum, Hastings has not established a genuine issue of material fact as to his breach of express warranty claim against Ford.  Thus, the Court **GRANTS** Ford's motion for summary judgment on Hastings's MMWA claim.

### B.    Fraud by Omission

Hastings's remaining claim against Ford is for fraud by omission.  The elements of fraud by omission are: (1) "the defendant must have concealed or suppressed a material fact"; (2) "the defendant must have been under a duty to disclose the fact to the plaintiff"; (3) "the defendant must have intentionally concealed or suppressed the fact with the intent to defraud the plaintiff"; (4) "the plaintiff must have been unaware of the fact and would not have acted as he did if he had known of the concealed or suppressed fact"; and (5) "as a result of the concealment or suppression of the fact, the plaintiff must have sustained damage." *Mktg. W., Inc. v. Sanyo Fisher (USA) Corp.*, 7 Cal. Rptr. 2d 859, 864 (1992). Hastings must show something more than the fact that his truck experienced problems; he "would need evidence that, prior to [his] purchase of the vehicle, [Ford] was aware of a defect . . . that it was either unwilling or unable to fix." *Santana v. FCA US, LLC*, 270 Cal. Rptr. 3d 335, 345 (2020) (explaining that the mere occurrence of fixable defects cannot

constitute proof of fraud by omission because "the very existence of a warranty presupposes that some defects may occur").

Ford argues that Hastings offers no evidence that Ford concealed or suppressed a material fact. Ford points out that Hastings has not offered expert testimony to show that the truck contained a defect at the time of sale. In addition, Ford argues that Hastings's own testimony at deposition suggests that he lacks proof of any defect that Ford knew existed and could have disclosed to him: Hastings testified that he had no basis to believe that Ford knew of a defect in the truck before it sold it to him (Hastings Dep. 86:15–18); he did not believe the truck's NOx sensor was defective at the time it left Ford's factory (*id.* 101:3–12); he believed transmission issues in his truck had been repaired (*id.* 82:1–9); and he held no opinion as to whether the fuel system of the truck was incompatible with the type of fuel to be used in the truck (*id.* 210:23–211:3). Ford has met its initial burden to establish the absence of a genuine issue of material fact as to an essential element of Hastings's fraud by omission claim.

The burden passes to Hastings to designate specific facts showing that there is a genuine issue for trial as to whether Ford concealed or suppressed a material fact. Hastings argues that Ford knew, prior to the sale of the truck, but failed to disclose that 2013 Ford F-350 6.7 diesel engine model trucks contained a defect that would cause NOx sensors to repeatedly fail. (Pl.'s Opp'n at 4, 13.) As evidence, Hastings cites his counsel's declaration, which states that in 2012, Ford released certain field service action campaigns (12B33 and 12B34) that were related to NOx sensor failure. (Sogoyan Decl. ¶ 5, ECF No. 95-2.) Hastings also cites Ford's 30(b)(6) witness's deposition transcript, in which the witness stated he understood the 2013 model trucks incorporated the updated calibrations discussed in those campaigns. (Kalis Dep. 213:23–215:12, Ex. 8 to Sogoyan Decl., ECF No. 95-2 at 418–20.) Hastings relies on these discussions of the 2012 field service campaigns to argue that the truck contained a design defect.

Hastings's theory is deficient for two reasons. As an initial matter, Hastings offers no proof that would show that the truck contained a design defect. *See supra* Part III.A.1.

- 27 -

He offers no witness testimony required by the risk/benefit test nor any evidence relevant to the consumer expectations test. Thus, no reasonable factfinder can find that the truck contained a design defect that should have been disclosed to Hastings.

To the extent that Hastings argues the 2012 field service action campaigns constitute evidence of a manufacturing defect, he must show, at a minimum, the specifics of what the field service action campaigns addressed. For example, courts have held that to prove the auto manufacturer's knowledge of the claimed defect based on a particular document, the contents of that document must be relevant to the specific defect alleged. *See, e.g.*, *Sloan v. Gen. Motors LLC*, No. 16-CV-07244-EMC, 2017 WL 3283998, at *7 (N.D. Cal. Aug. 1, 2017) (rejecting the plaintiffs' theory that a technical service bulletin could prove the manufacturer's knowledge of a defect in the vehicle's low-tension oil ring, where the bulletin only addressed a general problem, without mentioning the specific defect in the oil ring). Here, Hastings relies on his counsel's declaration that provides a vague description of the field service campaigns. Because Hastings's counsel lacks personal knowledge of Ford's field service campaigns, the Court may not rely on the declaration to determine the contents of the campaigns. *See* Fed. R. Civ. P. 56(c)(4) ("An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated."). Hastings offers no other evidence that shows the contents of the campaigns.

For these reasons, Hastings has not met his burden to designate specific facts showing that there is a genuine issue for trial as to the essential element of his fraud by omission claim: that Ford concealed a defect in the truck that was not fixable through warranty repairs. Therefore, the Court **GRANTS** Ford's motion for summary judgment on the fraud by omission claim.

//

//

//

### CONCLUSION

The Court **GRANTS IN PART AND DENIES IN PART** Hastings's motion to amend.  (ECF No. 87.)  The Court grants Hastings's request to abandon his negligent repairs claim and dismiss Ford of Chula Vista as a party.  In all other aspects, the Court denies Hastings's motion to amend his pleading because the requested amendment would be futile.

The Court **GRANTS** Ford's motion for summary judgment.  (ECF No. 85.)  The Court dismisses with prejudice Hastings's claims for MMWA breach of express warranty and fraud by omission.

**IT IS SO ORDERED.**

**DATED: March 22, 2022**

Hon. Cynthia Bashant
United States District Judge

19cv2217